**NOT RECOMMENDED FOR PUBLICATION**
File Name: 07a0474n.06
Filed: July 3, 2007

Nos. 06-3066 / 06-3734

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| AUREL VATA, | ) | ON REVIEW FROM THE |
| | ) | BOARD OF IMMIGRATION |
| Petitioner, | ) | APPEALS |
| | ) | (No. A97-105-442) |
| v. | ) | |
| | ) | |
| ALBERTO R. GONZALES, Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |

**BEFORE:**    SUTTON, COOK, Circuit Judges; and GWIN, District Judge.[*]

**GWIN, District Judge,** announced the judgment of the court and delivered an opinion, in which

SUTTON, J. and COOK, J., concurred except as to Parts III.A.1.b. (i) - (iii).

## I. Overview

Petitioner Aurel Vata is a native and citizen of Albania. On May 7, 2003, Vata filed an

Application for Asylum and Withholding of Removal, Form I-589, with the U.S. Immigration and

Naturalization Service ("INS"). On June 13, 2003, the INS served Vata with a Notice to Appear,

instituting removal proceedings against him. On December 12, 2003, at a hearing conducted before

Immigration Judge Elizabeth A. Hacker, Vata conceded removability pursuant to 8 U.S.C. §

1227(a)(1)(A) in that at the time of his entry, he was not in possession of a valid unexpired

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

-1-

immigrant visa, reentry permit, border crossing identification card, or other valid entry document. Vata also applied for relief in the form of asylum, withholding of removal, relief pursuant to Article 3 of the United Nations Convention Against Torture ("CAT"), and voluntary departure. On August 31, 2004, Immigration Judge Philip L. Morace conducted a final merits hearing, ordered that Vata be removed to Albania and denied all of the petitioner's applications for relief.

On September 27, 2004, Vata timely filed a Notice of Appeal with the Board of Immigration Appeals ("BIA" or "Board"). On December 21, 2005, the Board issued a per curiam order adopting and affirming the decision of the Immigration Judge with additions. Subsequently, on March 21, 2006, Vata filed a Motion to Reopen with the Board. On May 26, 2006, the Board denied Petitioner's Motion to Reopen.

Vata now seeks review of the Board's December 21, 2005 decision, alleging that the Board abused its discretion when it denied Petitioner's applications for asylum, withholding of removal, and relief under the CAT. Additionally, Vata seeks review of the Board's March 21, 2006 decision, alleging that (1) the Board abused its discretion in denying Petitioner's Motion to Reopen given his presentation of new and material evidence of changed country conditions in Albania; and (2) the Board violated Petitioner's due process rights by refusing to hold a new hearing as a result of Petitioner's new and material evidence.

For the following reasons, we **AFFIRM** the rulings of the Board. We **AFFIRM** the Board's denial of Vata's asylum application because Vata failed to establish (1) the Albanian government's inability or unwillingness to protect him from persecution; and (2) that internal relocation would not be a practical alternative. We also **AFFIRM** the Board's denial of Vata's applications for

withholding of removal and relief under CAT. We also **AFFIRM** the Board's denial of Vata's

Motion to Reopen because Petitioner failed to offer evidence that was both material and unavailable

at the time of his former hearing pursuant to 8 C.F.R. § 1003.2(c)(1). Finally, we find that the Board

**DID NOT VIOLATE** Vata's due process rights when it denied his Motion to Reopen.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Petitioner's Background

On June 9, 1981, the petitioner was born in Puke, Albania. Vata is a citizen of Albania and

holds an Albanian passport. Vata left Albania and traveled through Italy, Belgium, Holland and

Canada before entering the United States at Detroit, Michigan on October 12, 2002, with a fraudulent

U.S. passport. On May 1, 2003, Vata filed an Application for Asylum and Withholding of Removal

with the INS and requested relief pursuant to Article 3 of the CAT on the basis of his religion and

political opinion. On December 12, 2003, Vata filed a supplemental Application for Asylum and

Withholding of Removal.

On June 13, 2003, the INS served Vata with a Notice to Appear, charging him with

removability pursuant to 8 U.S.C. § 1227(a)(1)(A) because he was not in possession of a valid

unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry

document at the time of his entry. On December 12, 2003, at the second of two initial hearings, Vata

conceded removability pursuant to 8 U.S.C. § 1227(a)(1)(A). He also applied for asylum,

withholding of removal, relief under CAT, and voluntary departure.

### B.    Removal Hearing

On August 31, 2004, Immigration Judge Morace conducted a final merits hearing. The

petitioner initially testified about his background, religious activism and political beliefs. He then described two incidents of violence that purportedly motivated him to leave Albania.

With regard to his personal background, Vata testified that he had practiced Catholicism since childhood. From 1992 to 1995, Vata worked as a translator for the Sisters of Mother Teresa, "spreading the word of God" and encouraging others to join the Catholic Church. Between 1995 and 1999, Vata attended Pjeter Mushkalla, a seminary high school in Shkoder, Albania, that prepared students for priesthood. While at the seminary, Vata also taught catechism and the Bible to residents of the villages around Shkoder.

Vata testified that while working as a translator for the Sisters of Mother Teresa and other Catholic priests, people in the towns that he visited would express displeasure at his religious activism. Similarly, Vata described how his Muslim friends "start teasing me and just keeping away from me" when they discovered Vata had joined the seminary.

Vata eventually decided to leave the seminary. However, he still remained dedicated to spreading Catholicism as a lay person. In 1999, Vata moved with his family to Tirana, Albania, where he organized youth activities and Bible classes for the Youth Christian Center of Don Boskos until 2002.

With regard to his political opinion, Vata states in his application for asylum that he has never been a member of a political party. However, Vata claims that his father became a political prisoner for several years as an opponent of the communist regime. Likewise, Vata alleges that between 1990 and 1992, he and his family participated in anticommunist demonstrations and actively supported the Democratic Party. Finally, Vata describes that his brother was the driver for the

Parliament Member of the Democratic Party in Puke, and his relative was a deputy of the Democratic

Party between 1992 and 1996.

The first instance of violence that Vata claims drove him from Albania took place in 1997.

At this time, Vata was living in the Don Bosco Center of Shkoder, while studying at the seminary.

Vata testified that at approximately 1:00 a.m., twenty individuals attacked the Don Bosco Center,

breaking down the door and shooting at the seminary students inside. As the attackers invaded the

first floor of the building, Vata and his associates were forced to leap out of the windows of the

second floor in order to escape. Vata and the other occupants fled, but returned after a few hours.

He testified that they called the police when they returned, and he was unaware of any arrests made

as a result of this incident. Vata did not include a description of this incident in the personal

statement attached to his Application for Asylum and Withholding of Removal.

The second incident of violence immediately followed Vata's participation in a meeting

commemorating the anniversary of the September 11, 2001 terrorist attacks against the United

States. Vata testified that immediately after September 11, 2001, he discussed his feelings of shock,

fear and sadness with other people, including Muslims. Vata then described the response of his

Muslim acquaintances.

> A lot of them were happy for what happened. They just showing that the America,
> cause they see America is the terrorist, not them as the terrorist so they, they think
> that that was the right thing to do in the name of God and they were putting their
> faith, Muslim faith with the terrorist attack so I was, I was not happy to hear that and
> I was opposing them all the time for that.

In the personal statement attached to his asylum application, Vata stated, "Several of them Agron

Shabani, Arben Hoxha etc., threatened me to zip my mouth or I would pay it with my head."

On September 11, 2002, Vata and his friends held a memorial commemoration and prayer meeting marking the one-year anniversary of the terrorist attacks on the World Trade Center. Vata testified that he and his friend both spoke at the meeting. He also testified that a rumor began circulating that he had insulted Muslims and the Islamic faith at the commemorative meeting.

In the days immediately following the meeting, Vata received numerous threatening and insulting phone calls at his home. On September 15, 2002, Vata alleges that he was attacked by a group of four masked men outside his apartment. Vata testified that during the beating his attackers "were just telling me that that's what you deserve to protect Catholicism. To protect the Americans. And that, and they were threatening my life, too. We're gonna kill you. We're gonna kill your family." In his personal statement, Vata claimed he "got beaten, punched, kicked and threatened that they were going to kill me for christianizing and in support of the USA against the terrorism and their hero Bin Laden." Vata also testified that he could not recognize any of the men because they were masked.

As a result of the attack, Vata testified that he suffered head injuries and was bleeding. After the attack, his family transported him to a nearby clinic where he received treatment, antibiotics and pain-relieving drugs. Vata testified that his injuries forced him to stay in bed for approximately one week. Vata also submitted into evidence an affidavit from his treating physician, who diagnosed him with a "contusion of frontal region et akuli deseter" and prescribed a treatment of bed-rest, antibiotics and pain relievers over the course of seven days.

While recovering from his injuries at home, Vata says he continued to receive threatening and insulting phone calls, stating that he deserved what had happened to him. In his personal

statement, Vata claimed he was told, "'this is that you deserve after talking against Muslims and even America that you serve can't help you. If you tell anything to anybody we are going to send you with those people of 9/11.'" Although he attempted to discover the callers' identities, Vata testified that they refused to give him their names.

Vata testified that after his week of recovery, he went to the police station to file a report. However, the officer tasked with guiding individuals to the proper location at the station rebuked Vata and told him to go home. Specifically, Vata testified, "they just made joke at me and just telling me go home. That's, that's not real. Just go away." In response to further questioning from the Immigration Judge, Vata testified,

> there's always a cop sitting there just trying to address you where to go so I said (indiscernible) I had to report this event that happened to me a week ago and he was just laughing to me cause they just came to you and you're coming here and is saying that, that people getting killed. They're people getting shot and they don't come here to get, to do reports. Not you. What we gonna do? So just go away. It's not worth it. Go away and go home.

In his personal statement, Vata claims "I went to the police station to report what happened to me and about the p[h]one calls but they didn't believe me and send me away telling me to shut up my mouth." Believing his life was in danger, Vata decided to leave Albania. He departed within days of the Albanian authorities' failure to respond to his complaints.

In addition to testifying, Vata submitted into evidence two articles describing the killing of two Catholic priests in Albania. Responding, the government offered into evidence the Department of State Country Reports on Human Rights Practices for Albania and the 2001 and 2004 Profiles of Asylum Claims and Country Conditions concerning Albania. The government argued that these

documents establish Albania's religious tolerance and that believers in all religions may freely practice their faiths in that country. Likewise, the government claimed the reports demonstrated that the Albanian government quickly addresses any discord that develops among religious groups.

## C. Immigration Judge's Decision

On August 31, 2004, Immigration Judge Morace ordered that Vata be removed to Albania and denied all of the petitioner's applications for relief. Initially, the Immigration Judge noted that at an earlier hearing Vata conceded removability pursuant to 8 U.S.C. § 1227(a)(1)(A). The Immigration Judge then detailed three primary reasons for denying Vata's application for political asylum. Although finding that Vata had a subjective fear of future prosecution, he found that Vata failed to establish an objective fear of future persecution because he presented insufficient evidence regarding (1) the identity of his attackers; (2) the motive of his attackers; and (3) the Albanian government's unwillingness or inability to protect him from such persecution. The Immigration Judge also briefly noted that Vata never sought internal relocation and offered no evidence as to why internal relocation would not be a practical alternative.

The Immigration Judge found that Vata's testimony was subjectively genuine and credibly established a subjective fear of future persecution in Albania. However, the Immigration Judge issued a "mixed credibility finding. A positive credibility finding with regard to the respondent's subjective genuineness but negative with regard to the objective component of his fear." In support of his determination that Vata failed to establish an objective, well-founded fear of future persecution, the Immigration Judge cited the lack of sufficient detail in Vata's recollection of the September 15, 2002 attack and his failure to explain how his attackers "would have known about

his September 11, 2002 commemoration meeting." The Immigration Judge also noted a lack of background material bolstering the plausibility of the attack or the motive suggested by Vata. Instead, at various points throughout the oral opinion, the Immigration Judge mentions personal jealousy, retribution and hooliganism as possible alternative motives for the September 15, 2002 attack.

Finally, the Immigration Judge found that Vata presented insufficient evidence that Albanian authorities remain unwilling or unable to protect him from future persecution. The Immigration Judge downplayed the importance of Vata's testimony that an officer discouraged him from filing a report. Rather, the Immigration Judge found that Vata "gave up rather easily" and "made no effort to go back to the police or to seek protection from any other type of security units within Albania." Similarly, the Immigration Judge found the two articles regarding Catholic priests killed in Albania insufficient because the motive for the crimes was unclear.

In contrast, the Immigration Judge found that the country reports and human rights profiles supplied by the government significantly weakened Petitioner's claim for asylum. Although the Immigration Judge noted that "the Country Reports in no way should be the sole source of background information and it should be weighed in the context of the fact that there might be other reasons why certain things are in a Country Report and certain things are not," the reports suggested that Albania is recognized for its religious tolerance and that all religious groups freely practice their faith within the country. Likewise, the Immigration Judge found the reports contained "no evidence to indicate any pattern of government mistreatment of individuals on the basis of religious belief." Finally, the Immigration Judge cited the report's finding that "the government has been quick to

address cases of discord among religious groups."

For all of these reasons, the Immigration Judge denied Petitioner's application for political asylum. Given that Vata did not meet the "well-founded fear standard" for asylum, the Immigration Judge ruled that Vata necessarily could not meet the higher burden of "clear probability" required for withholding of removal. Finally, the Immigration Judge ruled that relief pursuant to Article 3 of CAT was foreclosed because he had "no information to demonstrate that the government acquiesced in the attack on [Vata] in September 2002."

**D.     BIA's Decision**

On September 27, 2004, Vata timely appealed the Immigration Judge's denial of his applications for asylum, withholding of removal and relief under CAT to the Board of Immigration Appeals. On December 21, 2005, the Board issued a per curiam order adopting and affirming the decision of the Immigration Judge with additions.

Primarily, the Board ruled that even considered cumulatively, the two incidents of violence described by the petitioner do not support a finding that Vata was a victim of past persecution. With regard to the Don Bosco shooting, the Board noted that Vata "was not harmed . . . and he was not sure whether or not the police responded to help."

With regard to the September 15, 2002 attack, the Board emphasized that Vata "was unsure of the identity of the callers or what they wanted." The Board also concluded that "his injuries were not shown to be serious." Finally, the Board highlighted an inconsistency between Vata's personal statement and his testimony. Within his personal statement, Vata claimed that the police did not believe him when he tried to report the September 15, 2002 incident. However, according to the

Board, Vata testified that the officer at the door of the station "told him that it wasn't worth reporting at that point because they would not be able to do anything." The Board suggested that the week delay in filing the report may have caused the officer's reaction.

Additionally, the Board noted that in light of the country reports and human rights profiles submitted by the government, Vata presented insufficient evidence to show that Albanian authorities were unwilling or unable to protect him from future persecution. Finally, given the background materials' description of Albania's religious tolerance, the Board upheld the Immigration Judge's ruling that "relocation appears to be a reasonable option for the respondent."

**E.      Motion to Reopen**

Subsequently, on March 21, 2006, Vata filed a Motion to Reopen with the Board. In support of his motion, Vata submitted the report of Dr. Bernd Fischer, an expert on Albania and Balkan affairs and a Professor of Balkan History at the University of Indiana. Fischer writes:

> Aurel Vata has established that he suffered persecution in the past. I also believe that on account of his family's political activism, on account of his status as a Catholic activist, and on account of the fact that he was threatened and attacked by individuals who were critical of his religion, if he were to return to Albania, persecution in the form of a threat to his safety is a reasonable possibility. Albanian authorities are unlikely to be able to significantly ameliorate that threat.

Likewise, Fischer warns "if forced to return and he has problems, he will likely receive no protection from the police, and in fact they may be his persecutors."

The report also (1) discusses the rise of political-economic corruption, political criminal organizations, police violence, Muslim fundamentalism, and religious persecution in Albania; and (2) says that relocation is not feasible within a small country like Albania. Finally, Fischer attacks

the validity of the country reports previously offered into evidence by the government and notes that

many other organizations have recently issued negative reports concerning the Albanian government.

On May 26, 2006, the Board denied Petitioner's Motion to Reopen, stating that Vata failed

to demonstrate that "current country conditions in Albania, when considered in conjunction with his

prior claim, give him an objectively reasonable fear of persecution in Albania." Initially, the Board

took notice of the report submitted "from someone claiming to be a history professor." The Board

then ruled, "Although the new evidence presented by the respondent continues to show that the

current conditions in Albania are turbulent, the respondent has not adequately demonstrated that his

situation is appreciably different from the dangers faced by all his fellow Albanians." Finally, the

Board noted, "the respondent's claimed expert witness was last in Albania in September of 2004."

### III. LEGAL STANDARDS & ANALYSIS

**A.  Issue One: Whether the BIA Abused its Discretion in Denying Petitioner's Applications for Asylum, Withholding of Removal, and Relief Pursuant to CAT**

The standards of review governing applications for asylum, withholding of removal, and

relief under CAT are identical. Questions of law are reviewed *de novo*. *Singh v. Gonzales*, 451 F.3d

400, 403 (6th Cir. 2006). However, "administrative findings of fact are conclusive unless any

reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

"The standard set out in § 1252 codifies the substantial evidence standard previously set forth by the

Supreme Court in *INS v. Elias-Zacarias*, 502 U.S. 478, 481, 117 L. Ed. 2d 38, 112 S. Ct. 812

(1992)." *Thermija v. INS*, 102 Fed. Appx. 920, 921 (6th Cir. 2004). Thus, the Board's

determination that Vata was not eligible for asylum must be affirmed if "supported by reasonable,

substantial, and probative evidence on the record considered as a whole." *Elias-Zacarias*, 502 U.S. at 481. Likewise, "in order to reverse the BIA's factual determinations, the reviewing court must find that the evidence not only supports a contrary conclusion, but indeed compels it." *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992) (citing *Elias-Zacarias*, 502 U.S. at 481).

1.      Petitioner's Application for Asylum

a.      *Law Governing Applications for Asylum*

An alien seeking asylum must (1) qualify as a "refugee" as defined by 8 U.S.C. § 1101(a)(42)(A); and (2) merit a favorable exercise of discretion by an immigration judge. 8 U.S.C. § 1158(b)(1)(A); 8 C.F.R. § 208.14(a). 8 U.S.C. § 1101(a)(42)(A) defines "refugee" as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

Likewise, "[t]he applicant may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution." 8 C.F.R. § 208.13(b).

8 C.F.R. § 208.13(b)(1) establishes that past persecution can be demonstrated by showing that an applicant has experienced "persecution in the past in the applicant's country of nationality on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution." A victim of past persecution "shall also be presumed to have a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. § 208.13(b)(1). The

-13-

government may rebut this presumption by showing by a preponderance of the evidence that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality." 8 C.F.R. § 208.13(b)(1)(i)(A). In the event that the government successfully rebuts the presumption of a well-founded fear of future persecution, asylum may still be granted if the applicant "has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution." 8 C.F.R. § 208.13(b)(1)(iii)(A).

An applicant can establish a well-founded fear of future persecution pursuant to 8 C.F.R. § 208.13(b)(2) by establishing that:

> (1) he or she has a fear of persecution in his or her country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) there is a reasonable possibility of suffering such persecution if he or she were to return to that country; and (3) he or she is unable or unwilling to return to that country because of such fear.

*Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998). Likewise, "[a]n applicant's fear of persecution must be both subjectively genuine and objectively reasonable." *Id.* However, "[a] well-founded fear of persecution does not require the applicant to show that he probably will be persecuted if he is deported; 'one can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.'" *Perkovic v. INS*, 33 F.3d 615, 621 (6th Cir. 1994) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987)).

A determination that internal relocation is a reasonable option precludes finding a well-founded fear of persecution. "An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of

nationality, if under all the circumstances it would be reasonable to expect the applicant to do so."

8 C.F.R. § 208.13(b)(2)(ii). In determining the reasonableness of internal relocation, adjudicators

may consider "whether the applicant would face other serious harm in the place of suggested

relocation; any ongoing civil strife within the country; administrative, economic, or judicial

infrastructure; geographical limitations; and social and cultural constraints, such as age, gender,

health, and social and familial ties." 8 C.F.R. § 208.13(b)(3).

In cases where persecution is government-sponsored or the applicant has established past

persecution, "it shall be presumed that internal relocation would not be reasonable, unless the

Service establishes by a preponderance of the evidence that, under all the circumstances, it would

be reasonable for the applicant to relocate." 8 C.F.R. § 208.13(b)(3)(ii). However, "[i]n cases in

which the applicant has not established past persecution, the applicant shall bear the burden of

establishing that it would not be reasonable for him or her to relocate." 8 C.F.R. § 208.13(b)(3)(i).

Finally, with regard to an immigration judge's exercise of discretion, "the totality of the

circumstances and actions of an alien in his flight from the country where he fears persecution should

be examined in determining whether a favorable exercise of discretion is warranted." *Matter of Pula*,

19 I. & N. Dec. 467, 473 (BIA 1987). Other factors to be considered include whether the applicant

passed through any other countries, the length of time the applicant remained in a third country,

whether the applicant has personal ties to this country, and general humanitarian concerns. *Id.* at

473-74. "[T]he danger of persecution should generally outweigh all but the most egregious of

adverse factors." *Id.* at 474.

b.        *Analysis of Petitioner's Application for Asylum*

Given that the Board issued a per curiam order adopting and affirming the decision of the Immigration Judge with additions, we review both the decision of the Immigration Judge and the additions provided by the Board as the final administrative order. *See Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006). The Immigration Judge denied Vata's application for asylum on three primary grounds: Vata presented insufficient evidence regarding (1) the identity of his attackers; (2) the motive of his attackers; and (3) the Albanian government's unwillingness or inability to protect him from such persecution. The Immigration Judge also found that Vata never sought internal relocation and offered no evidence as to why internal relocation would not be a practical alternative. Finally, the Board found that none of the injuries reported by the petitioner were serious.

As we consider the reasonableness of the denial of Vata's application for asylum, we first note that the Immigration Judge determined Vata's testimony was subjectively genuine and credibly established a subjective fear of future persecution in Albania. However, the Immigration Judge issued a "mixed credibility finding. A positive credibility finding with regard to the respondent's subjective genuineness but negative with regard to the objective component of his fear." Further analyzing this ruling, it is apparent that the Immigration Judge never doubted the veracity of Vata's testimony. Rather, the Immigration Judge found that his testimony alone was insufficient to establish an objective well-founded fear of future persecution.

(i)     Identity of Persecutors

We do not find Vata's inability to precisely identify his attackers to be a reasonable basis for denying his application for asylum. 8 C.F.R. § 208.13(b)(1) states that past persecution is established when an applicant has experienced "persecution in the past in the applicant's country of

-16-

nationality on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution." Thus, unless an applicant argues that he or she was persecuted by agents of the government, the precise identification of one's persecutors is unnecessary so long as the applicant can establish the motive for his or her persecution.

(ii)     Motive of Persecutors

At the same time, Vata does have the burden to demonstrate that he was persecuted "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.13(b)(1). We find the Immigration Judge's determination that Vata failed to do so unsupported by substantial evidence.

Adjudication of asylum applications requires examination of the totality of the circumstances. *Pula*, 19 I. & N. Dec. at 473. To demonstrate past persecution, Vata need not disprove every possible motive other than those delineated in 8 C.F.R. § 208.13(b)(1). In the instant case, twenty individuals attacked the Don Bosco Center of Shkoder where Vata lived. They broke down the door and shot at the seminary students at approximately 1:00 a.m. Vata argues that this severe attack on a known residence of Catholic seminarians could only have been motivated by the religious affiliation of the Center's inhabitants. The government offers no alternative motive for the attack.

With regard to the encounter on September 15, 2002, the incident occurred immediately after Vata participated in a prayer meeting commemorating the one-year anniversary of the terrorist attacks against the United States. The Immigration Judge credited Vata's testimony that a rumor began circulating that he had insulted Muslims and the Islamic faith. Days prior to the attack, Vata

-17-

received numerous threatening and insulting phone calls at his home. He was then severely beaten by four masked men outside his apartment. Vata credibly testified that during the attack, the men told him "that's what you deserve to protect Catholicism. To protect the Americans." Subsequent to the attack, he received additional threatening and insulting phone calls in which individuals exclaimed "'this is that you deserve after talking against Muslims and even America that you serve can't help you. If you tell anything to anybody we are going to send you with those people of 9/11.'"

Throughout his oral opinion, the Immigration Judge suggested personal jealousy, retribution and hooliganism as alternative motives for the September 15, 2002 attack. He also questioned how Vata's attackers would have known about the commemorative meeting. Neither the Immigration Judge nor the BIA posed alternative motives for the Don Bosco shooting.

Whereas personal jealousy and retribution "for reasons that are not clear to the Court" are possible motives for the September 15, 2005 attack, there is no evidence whatsoever to suggest these sentiments were in fact the bases for Vata's beating at the hands of four masked men. Similarly, if Vata had simply been mugged or attacked at random on the street, the potential for hooliganism might be greater. However, this beating occurred just days after the prayer meeting and subsequent rumor of Vata's disrespect for Muslims. Combined with the threats that Vata would be killed "for christianizing and in support of the USA against the terrorism and their hero Bin Laden" made before, during and after the attack, these circumstances severely reduce the possibility that mere hooliganism was the cause of the September 15, 2002 incident. Finally, the IJ and Board were unreasonable to classify as hooliganism twenty armed men firing upon and forcibly invading a known residence of Catholic seminarians at 1:00 a.m., causing the occupants to leap out second-story

windows and flee the area.

As such, we find the Immigration Judge's determination that Vata failed to demonstrate he was persecuted "on account of race, religion, nationality, membership in a particular social group, or political opinion" to be unreasonable.

(iii) Severity of Persecution

In its decision denying asylum, the Board noted that none of the injuries reported by the petitioner were serious. The petitioner bears the burden to demonstrate that the attacks against him rose to the level of persecution and not mere harassment. *Asani v. INS*, 154 F.3d 719, 723 (7th Cir. 1998). However, Vata need not prove that he received "serious injuries" as a result of the attacks in order to establish past persecution. *Id.*; *see Begzatowski v. INS*, 278 F.3d 665, 670 (7th Cir. 2002) ("we previously have rejected attempts by the BIA to impose on asylum applicants the additional burden of establishing permanent or serious injuries as a result of their persecution"). Rather, persecution has been defined as "'punishment' or 'the infliction of harm.'" *Id.*; *see also Prasad v. INS*, 47 F.3d 336, 339 (9th Cir. 1995) ("suffering or harm").

It is also important to clarify the difference between the severity of harm required to demonstrate past persecution alone as opposed to past persecution accompanied by a well-founded fear of future persecution. "Mild persecution may be something of an oxymoron, but the regulation makes clear that a refugee who has no reasonable fear of future persecution must indeed prove that his past persecution was a severe rather than a mild (bordering on 'mere' discrimination) form of persecution." *Bucur v. INS*, 109 F.3d 399, 406 (7th Cir. 1997). Courts have also held that "threats of violence and death are enough" to constitute persecution. *Cordon-Garcia v. INS*, 204 F.3d 985,

991 (9th Cir. 2000); *see also Thomas*, 359 F.3d at 1179 ("escalating scheme of intimidation and a real threat of physical violence" deemed persecution); *Singh v. INS*, 94 F.3d 1353, 1360 (9th Cir. 1996) ("There is no question that persistent death threats and assaults on one's life, family, and business rise to the level of persecution within the meaning of the Act."). Because we are compelled to find that the cumulative effects of the two incidents did rise to the level of "persecution," we reject the Board's additional rationale for denying Vata's asylum application.

The violent incidents described by Vata constitute a level of punishment, suffering and infliction of harm sufficient to establish past persecution. The storming of the Don Bosco Center posed a severe threat to Vata's life. His lack of bullet wounds does not diminish the terror and suffering caused by the small militia's armed invasion and gunfire, which drove Vata from his home.

Additionally, on September 15, 2002, Vata was repeatedly beaten and kicked by four masked men saying, "We're gonna kill you. We're gonna kill your family." As a result of the attack, Vata testified that he suffered head injuries and was bleeding. He submitted clinical documentation prescribing a treatment of bed-rest, antibiotics and pain relievers over the course of seven days. Both prior and subsequent to the September 15, 2002 attack, Vata received numerous phone calls threatening further harm and death if he continued to speak out or informed the authorities of the attack. This escalating scheme of intimidation and actual violence, considered along with the Don Bosco shooting, was a level of punishment, suffering and infliction of harm sufficient to establish past persecution. As such, the BIA's denial of Vata's asylum application cannot be justified on the basis of the severity of his injuries.

(iv)    Inability or Unwillingness to Protect

-20-

The Immigration Judge's third rationale for denying Vata's asylum application was that Vata presented insufficient evidence that Albanian authorities remain unwilling or unable to protect him from future persecution. Because we find that substantial evidence does not compel a different result, we affirm the Immigration Judge's denial of Vata's asylum application on these grounds.

8 C.F.R. § 208.13(b)(1) establishes that a finding of past persecution requires the applicant to be subjectively and objectively "unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution." With regard to the Don Bosco shooting, the BIA noted that Vata "was not sure whether or not police responded to help." Vata actually testified that the police were called, but that he was unaware of any arrests resulting from the incident. Although the Immigration Judge noted that 1997 was a "time of particular turmoil in Albania," the shooting and forcible invasion of a known residence of Catholic seminarians still signifies a severe threat to public safety deserving of an official response. However, Vata's testimony does not conclusively reveal whether police conducted an investigation or whether arrests were actually made. Rather, Vata simply claims ignorance of any official reaction that may or may not have taken place.

With regard to the September 15, 2002 attack, the Immigration Judge found that although the officer near the entrance of the police station discouraged Vata from filing a report, the petitioner "gave up rather easily." Additionally, Vata "made no effort to go back to the police or to seek protection from any other type of security units within Albania." Although it is unclear what "other type of security units" could have responded to this incident or prevented further attacks, Vata's claim would have been strengthened by further evidence that the Albanian authorities were unwilling or unable to protect him after the September 15, 2002 incident.

-21-

The BIA also found that it was "unclear whether the timing of the report was the reason for the police officer's reaction." Vata testified that the police "just made joke at me and just telling me go home." In response to further questioning from the Immigration Judge, Vata explained,

> he was just laughing to me cause they just came to you and you're coming here and is saying that, that people getting killed. They're people getting shot and they don't come here to get, to do reports. Not you. What we gonna do? So just go away. It's not worth it. Go away and go home.

From this testimony, it appears as though the police downplayed the severity of the attack as opposed to querying why Vata waited a week to file a report. However, Vata's decision to recover from his injuries before approaching the authorities may have contributed to their ineffectiveness if they were, in fact, willing to investigate Vata's claim.

In any case, rather than returning to the station some other day or requesting to speak with the officer's supervisor or the individual in charge of filing reports, Vata fled the country. Admittedly, Vata's personal statement described how the threatening phone calls received subsequent to September 15, 2002, warned that he would be killed if he informed the authorities of the attack. Yet, without further information demonstrating the unreliability of the Albanian police, the Immigration Judge and the Board of Immigration Appeals were not unreasonable when they concluded that Vata failed to demonstrate that Albanian authorities were unwilling or unable to protect him.

Similarly, the Immigration Judge found that the two articles submitted by Vata regarding Catholic priests killed in Albania provided only minimal support for Vata's asylum application because the motive for their murders was unclear. The first article, dated October 11, 2001,

describes an Italian priest who was repeatedly stabbed to death. Although the authorities ruled out robbery as a motive due to the 500,000 Albanian Lek that remained untouched by the perpetrator, the article states, "[r]eason of this incident are still unknown and the experts are working in the investigation said the police source." The second article, dated August 11, 2000, states only that "Fr. Joaquin Bernardo, 42, a Dominican priest working in Albania to make the electoral system more democratic has been found bound and strangled in Tirana, the capital."

Neither article suggests, let alone presents any evidence supporting the assertion, that the priests were killed as a result of their religious activism. Significantly, neither article mentions any Government failure to properly investigate the incidents. In fact, the first article even references the on-going criminal investigation. As such, the reported murders of two priests within the span of two years, without any evidence of police misconduct or a political or religious motivation for the killings, fail to establish that the Albanian police are unwilling or unable to protect Vata from persecution.

In contrast, the government submitted into evidence the Department of State Country Reports on Human Rights Practices for Albania and the 2001 and 2004 Profiles of Asylum Claims and Country Conditions concerning Albania. These background materials contradict Vata's contention that the Albanian authorities were unwilling or unable to protect him from persecution. Specifically, the Immigration Judge cited the 2004 Profile of Asylum Claims and Country Conditions, which states that Albania is "recognized for its religious tolerance," and "all religious groups freely practice their faith." Likewise, the profile explains, "[t]here has been no evidence to indicate any pattern of government mistreatment of individuals on the basis of religious belief. Moreover, the government

-23-

has been quick to address cases of discord among religious groups."

Ultimately, beyond Vata's own testimony, the record is devoid of other reliable evidence of the Albanian authorities' inability or unwillingness to protect Vata from persecution. The Board of Immigration Appeals affirmed the Immigration Judge's ruling that this insufficiency precluded a finding of past persecution. Likewise, Vata's failure to demonstrate the Albanian government's inability or unwillingness to protect him precludes a finding of an objective, well-reasoned fear of future persecution because Vata has not established a "reasonable possibility of suffering such persecution if he or she were to return to that country." 8 C.F.R. § 208.13(b)(2)(B). Given that substantial evidence does not compel a different result, we affirm the Board's denial of Vata's asylum application on these grounds.

(v)    Internal Relocation

In addition, "[a]n applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality, if under all the circumstances it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(2)(ii). "In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate." 8 C.F.R. § 208.13(b)(3)(i).

In the instant case, the Immigration Judge briefly noted that "internal relocation apparently was never sought by the respondent." Indeed, at that time, Vata offered no evidence as to why internal relocation would not be a practical alternative. On the other hand, the government submitted three country reports and profiles suggesting that even if Vata had endangered himself by actively

participating in the September 11, 2002 commemorative meeting, he would have little trouble

relocating to another part of Albania where he could avoid future persecution. As Vata presented

no evidence to the contrary, we affirm the Board's ruling denying Vata's asylum application on the

basis that Vata failed to establish that internal relocation was not a reasonable option.

2.      Petitioner's Application for Withholding of Removal

Unlike discretionary grants of asylum, withholding of removal is mandatory if an applicant

fulfills the conditions of 8 U.S.C. § 1231(b)(3)(A). "[T]he Attorney General may not remove an

alien to a country if the Attorney General decides that the alien's life or freedom would be threatened

in that country because of the alien's race, religion, nationality, membership in a particular social

group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). "In order to make this showing, the alien

must establish a 'clear probability' of persecution on account of one of the enumerated grounds.

This clear probability standard requires a showing that it is more likely than not that an alien would

be subject to persecution." *Matter of Mogharrabi*, 19 I. & N. Dec. 439, 440 (BIA 1987) (citing *INS

v. Stevic*, 467 U.S. 407, 413 (1984)); *see also* 8 C.F.R. § 208.16(b)(2).

"An application seeking withholding of deportation faces a more stringent burden of proof

than one for asylum." *Mikhailevitch*, 146 F.3d at 391. As such, an applicant who is ineligible for

asylum necessarily "cannot satisfy the more stringent standard for withholding of deportation."

*Daneshvar v. Ashcroft*, 355 F.3d 615, 625 (6th Cir. 2004). Given that we affirm the Board's ruling

denying Vata's asylum application because Vata failed to establish (1) the Albanian government's

inability or unwillingness to protect him from persecution; and (2) that internal relocation would not

be a practical alternative, we must necessarily affirm the Board's denial of Vata's application for

withholding of removal because Vata failed to establish a "clear probability" that his life or freedom would be threatened if he returned to Albania.

3.       Petitioner's Application for Relief Under CAT

a.       *Law Governing Applications for Relief Under CAT*

Similar to withholding of removal, an immigration judge is required to provide relief under CAT when an applicant establishes "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 208.16(c)(2).  Article 3 of CAT provides:

> (1)  No state party shall expel, return, ('refouler') or extradite a person to another state where there are substantial grounds for believing that he would be in danger of being subjected to torture. (2)  For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant, or mass violations of human rights.

8 C.F.R. § 208.18(a)(1) defines torture as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

The "more likely than not" standard is identical to the applicant's burden when seeking withholding of removal.  *See* 8 C.F.R. § 208.16(b)(2).  Likewise, "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."  8 C.F.R. § 208.16(c)(2).  Finally, evidence relevant to determining the possibility of future torture may include

(i) Evidence of past torture inflicted upon the applicant; (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and (iv) Other relevant information regarding conditions in the country of removal.

8 C.F.R. § 208.16(c)(3).

b.      *Analysis of Petitioner's Application for Relief Under CAT*

The Immigration Judge ruled that he had "no information to demonstrate that the government acquiesced in the attack on [Vata] in September 2002 so relief under Article 3 Convention Against Torture would not be available." Vata properly notes that "the BIA's decision with respect to an alien's claims for asylum and withholding of removal pursuant to the INA should never, in itself, be determinative of the alien's CAT claim." *Ramsameachire v. Ashcroft*, 357 F.3d 169, 185 (2d Cir. 2004) (citing *Kamalthas v. INS*, 251 F.3d 1279, 1283 (9th Cir. 2001) ("a claim under the Convention is not merely a subset of claims for either asylum or withholding of removal")). However, the *Kamalthas* Court highlighted an essential distinction among the standards:

> In an important sense, then, the Convention's reach is both broader and narrower than that of a claim for asylum or with-holding of deportation: coverage is broader because a petitioner need not show that he or she would be tortured 'on account of' a protected ground; it is narrower, however, because the petitioner must show that it is 'more likely than not' that he or she will be tortured, and not simply persecuted upon removal to a given country.

251 F.3d at 1283. Therefore, with regard to the standard governing the likelihood of future torture, the "'more likely than not' burden of proof is similarly higher than the 'well-founded fear' burden required to establish a claim for asylum." *Ramaj*, 466 F.3d at 532.

As such we find that the Board's affirmation of the Immigration Judge's denial of Vata's

application for relief under CAT was supported by substantial evidence. The Immigration Judge's analysis, though brief, pertains directly to an element shared between claims for asylum and relief under CAT: the "consent or acquiescence" of public officials. 8 C.F.R. § 208.18(a)(1). We previously determined that Vata failed to establish a "well-founded fear of future persecution" as a result of insufficient evidence that the Albanian government was unable or unwilling to protect him. This ruling necessarily precludes a finding that Vata established it is "more likely than not" that he will be tortured "with the consent or acquiescence of a public official." 8 C.F.R. § 208.18(a)(1).

**B.      Issue Two: Whether the BIA Abused its Discretion in Denying Petitioner's Motion to Reopen**

1.      Standard of Review and Law Governing Motions to Reopen

"The decision to grant or deny a motion to reopen or reconsider is within the discretion of the Board." 8 C.F.R. § 1003.2(a). "A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1). Likewise, "[A] motion to reopen will not be granted unless the respondent establishes a prima facie case of eligibility for the underlying relief sought." *In re S-V-*, 22 I. & N. Dec. 1306, 1307 (BIA 2000). "[A] respondent demonstrates prima facie eligibility for relief where the evidence reveals a reasonable likelihood that the statutory requirements for relief have been satisfied." *Id.* at 1308. The Board has not "required a conclusive showing that eligibility for relief has been established." *Id.* Instead, the BIA reopens proceedings "where the new facts alleged, when coupled with the facts already of record, satisfy [the BIA] that it would be worthwhile to develop the issues further at a plenary

hearing on reopening." *Matter of Sipus*, 14 I. & N. Dec. 229, 231 (BIA 1972).

We review the BIA's denial of Petitioner's Motion to Reopen for abuse of discretion. *INS v. Abudu*, 485 U.S. 94, 107 (1988). "In determining whether the Board abused its discretion, this Court must decide whether the denial of Petitioner's motion to reopen . . . was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Balani v. INS*, 669 F.2d 1157, 1161 (6th Cir. 1982). "Legal issues are reviewed de novo." *Harchenko v. INS*, 379 F.3d 405, 309 (6th Cir. 2004).

2.      Analysis of Petitioner's Motion to Reopen

On March 21, 2006, Vata filed a Motion to Reopen with the Board. In support of his motion, Vata submitted the report of Dr. Bernd Fischer, an expert on Albania and Balkan affairs. On May 26, 2006, the Board of Immigration Appeals denied Petitioner's Motion to Reopen, stating that Vata failed to demonstrate that "current country conditions in Albania, when considered in conjunction with his prior claim, give him an objectively reasonable fear of persecution in Albania."

Initially, we find that the majority of information contained within Fischer's report was discoverable at the time of Petitioner's initial merits hearing held on August 31, 2004. Pursuant to 8 C.F.R. § 1003.2(c)(1), such evidence is ineffective in support of a motion to reopen. Additionally, Fischer's report does not contain evidence of *changed* country conditions in Albania. Rather, the allegedly new and material evidence depicts a level of corruption and intolerance that has plagued Albania throughout the past decade. Finally, the data that was unavailable at the time of Petitioner's initial merits hearing fails to evince a "reasonable likelihood that the statutory requirements for relief

-29-

have been satisfied." *In re S-V-*, 22 I. & N. Dec. at 1308.

Importantly, Fischer's report provides virtually no material evidence that was both unavailable at the time of Petitioner's initial merits hearing and effectively supports Vata's fear of religious persecution. The only undiscoverable information was Fischer's statement, "In September 2005 Ilir Kulla, the vice-chairman of the Muslim community resigned after stating that he had been threatened by the radical mufti of Elbasan." At best, this statement reveals an incremental escalation of Muslim extremism within Albania. However, this information does not constitute new and material evidence sufficient to warrant a plenary hearing on reopening. Likewise, all information within Fischer's report discussing Vata's potential internal relocation within Albania was discoverable at the time of Petitioner's initial merits hearing.

In denying Vata's Motion to Reopen, the Board of Immigration Appeals ruled that "[a]lthough the new evidence presented by the respondent continues to show that the current conditions in Albania are turbulent, the respondent has not adequately demonstrated that his situation is appreciably different from the dangers faced by all his fellow Albanians." For example, Fischer's report describes the corruption surrounding the Albanian election of July 2005, which was accompanied by "violence against the political activists of most of the major parties, and death." While bolstering notions of Albania's political instability, the danger described by Fischer remains a reality for an enormous segment of Albania's population.

Likewise, some of the information presented in Fischer's report is only tangentially relevant. Fischer cites the police beating of a "Socialist Party member of parliament." Given that Vata's imputed political opinion represents the Socialist Party's direct opposition, this information fails to

provide adequate support for Vata's fear of future persecution.  Similarly, Fischer quotes the Chief of the Albanian Service of the Voice of America as recently stating, "On too many occasions in recent years, the international community has been unusually, and in my opinion needlessly, restrained in its criticism of developments in Albania."  Whereas this comment somewhat weakens the validity of the country reports submitted by the government, this information remains insufficient to establish a prima facie case of eligibility for the underlying relief sought by Vata.

The most significant evidence presented in Fischer's report is his citation of "a brutal attack on two of the most prominent Democratic Party affiliated newspaper editors."  This incident provides some indication that activists within Vata's imputed party have been targeted for persecution as a result of their political beliefs.  However, Fischer's brief description contains no evidence of government acquiescence.  Once again, we are left with no information as to whether this incident was properly investigated or if the attackers were eventually apprehended or appropriately punished.

The Supreme Court has held that:

> If INS discretion is to mean anything, it must be that the INS has some latitude in deciding when to reopen a case. The INS should have the right to be restrictive. Granting such motions too freely will permit endless delay of deportation by aliens creative and fertile enough to continuously produce new and material facts sufficient to establish a prima facie case.

*Abudu*, 485 U.S. at 108.  Even when viewed in conjunction with the other previously undiscoverable evidence within Fischer's report, as well as the evidence Vata presented at his original merits hearing, the attack on the Democratic Party newspaper editors fails to reveal a reasonable likelihood that Vata's statutory requirements for relief have been satisfied.  As such, we **AFFIRM** the Board's

denial of Petitioner's Motion to Reopen. We find that the Board did not abuse its discretion because its decision was made with a rational explanation and did not depart from established policies.

**C.      Issue Three: Whether the BIA Violated Petitioner's Right to Due Process when Denying Petitioner's Motion to Reopen**

1.      Standard of Review and Law Governing Due Process Violations

"[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see also Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."). The Sixth Circuit has held that aliens in removal proceedings are entitled to a "full and fair hearing." *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001); *see also Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (due process requires an opportunity to be heard "at a meaningful time and in a meaningful manner"); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950) (due process requires "an opportunity for hearing appropriate to the nature of the case").

Furthermore, due process requires an adjudicator to actually consider the evidence and argument presented by the parties. *Morgan v. United States*, 298 U.S. 468, 481 (1936). Even an exercise of discretion requires "some level of individualized determination" in order to comply with the requirements of due process. *Flores*, 507 U.S. at 313; *see also U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). We review claims of due process violations in removal proceedings *de novo*. *Huicochea-Gomez*, 237 F.3d at 699.

2.      Analysis of Due Process Violation

Due process requires each case to be "evaluated on its own merits to determine whether the alien's factual support and concrete evidence are sufficient to establish a clear probability of persecution." *Sarvia-Quintanilla v. INS*, 767 F.2d 1387, 1392 (9th Cir. 1985). In the instant case, we find that the Board's denial of Vata's Motion to Reopen, while cursory, did not violate Petitioner's right to due process.

With regard to an individualized determination of the merits, the Board found that "the new evidence submitted by the respondent in connection with his motion to reopen does not satisfy these exacting standards." Specifically, the Board noted that Vata's motion to reopen was "based on a report from someone claiming to be a history professor." However, the Board found that "[a]lthough the new evidence presented by the respondent continues to show that the current conditions in Albania are turbulent, the respondent has not adequately demonstrated that his situation is appreciably different from the dangers faced by all his fellow Albanians." This sentiment tracks this Court's aforementioned analysis of Vata's Motion to Reopen. Finally, the Board concluded its decision by noting that Fischer "was last in Albania in September of 2004," signaling not only that the Board read and properly evaluated Fischer's report, but also that a significant portion of the information provided therein was obtainable at the time of Vata's original merits hearing.

Due process does not require that the Board "list every possible positive and negative factor in its decision." *Scorteanu v. INS*, 339 F.3d 407, 412 (6th Cir. 2003) (citing *Rodriguez-Rivera v. INS*, 993 F.2d 169, 170-71 (8th Cir. 1993)). Indeed, the Board "has no duty to write an exegesis on every contention. What is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and

not merely reacted." *Scorteanu*, 339 F.3d at 412 (citing *Osuchukwu v. INS*, 744 F.2d 1136, 1142-43 (5th Cir. 1984)). Given that we find that the Board properly considered Fischer's report and issued an individualized determination of Vata's claims, we find that the Board **DID NOT VIOLATE** Vata's due process rights when it denied Petitioner's Motion to Reopen.

## IV. CONCLUSION

For the aforementioned reasons, we **AFFIRM** the rulings of the Board. We **AFFIRM** the Board's denial of Vata's asylum application because Vata failed to establish (1) the Albanian government's inability or unwillingness to protect him from persecution; and (2) that internal relocation would not be a practical alternative. We also **AFFIRM** the Board's denial of Vata's applications for withholding of removal and relief under CAT. We also **AFFIRM** the Board's denial of Vata's Motion to Reopen because Petitioner failed to offer evidence that was both material and unavailable at the time of his former hearing pursuant to 8 C.F.R. § 1003.2(c)(1). Finally, we find that the Board **DID NOT VIOLATE** Vata's due process rights when it denied his Motion to Reopen.